## In re HABEAS CORPUS CASES.

### No. 03–MISC–0066 (JBW).

United States District Court,
E.D. New York.

Dec. 11, 2003.

MEMORANDUM

WEINSTEIN, Senior District Judge.

### Report on 500 Habeas Corpus Cases

Date: December 11, 2003
To: Hon. Edward R. Korman, Chief Judge
From: Hon. Jack B. Weinstein, Senior Judge
Cc: Judges and Magistrate Judges, E.D.N.Y.
Subject: Habeas Corpus Proceedings by State Prisoners

## Table of Contents

I. Acknowledgments ............................................................. 304

II. Importance of Habeas Corpus ............................................. 305

III. New York State Protections ............................................. 306

IV. The Cases ................................................................. 307
 A. Statistics ......................................................... 307
 B. Grants of the Writ ............................................... 307
 1. *Thomas v. Kuhlmann*, 97–CV–2096 .................. 307
 2. *Harris v. Artuz*, 97–CV–2135 ....................... 308
 3. *Benn v. Greiner*, 98–CV–5621 ....................... 308
 4. *Batten v. Greiner*, 97–CV–2378 .................... 309
 5. *Eisemann v. Herbert*, 99–CV–2826 ............... 309
 6. *Cox v. Donnelly*, 99–CV–8216 ...................... 310
 7. *Jackson v. Edwards*, 01–CV–0501 ................ 310
 8. *Pulinario v. Goord*, 02–CV–3681 ................. 310
 9. *Somerville v. Conway*, 02–CV–6679 ............ 311

V. Reasons for Speedy Disposition ......................................... 311
 A. Petitioner ........................................................ 311
 B. State System .................................................... 312
 C. Federal System ................................................. 312

VI. Proposed Procedures ..................................................... 313
 A. Timing ............................................................ 313
 B. Procedures ....................................................... 313
 C. Filing and Control by Paraprofessionals in Clerk's Office .................. 314
 D. Division of Court's Workload .................................. 315

VII. Conclusion ................................................................ 317

I have the honor of reporting to you on the disposition of the five-hundred habeas corpus cases challenging alleged unconstitutional custody of state prisoners that you assigned to me earlier this year. Written decisions have been issued in each closed case and have been docketed under a miscellaneous case number, 03–Misc–0066. All of the decisions are available on the court's electronic database, and many have been added to the commercial databases. More than three dozen have been printed in the Federal Supplement and Federal Rules Decisions.

### I. Acknowledgments

First, I should like to thank you for the privilege of considering these cases. Ours is a heavily overloaded court with extremely hard-working judges, magistrate judges and staff. Constantly expanding bases of federal jurisdiction and sharply reduced budgets have compounded our difficulty in promptly disposing of these habeas cases despite the need for swift disposition.

Second, it is fitting to acknowledge the extraordinary work of Marc Falkoff, my former law clerk and a distinguished practitioner. He was appointed by you and by me as Special Master to assist in the disposition of these cases. In addition to assuming punishing long hours and applying his high intellect to the project, he has developed a strong teaching component of the work. His first and second editions of what amounts to a mini-treatise on habeas corpus have been used widely in this and other courts to instruct court personnel. He has lectured extensively within this court and elsewhere to attorneys, law clerks, students and others, and will be

teaching a course on the subject at Brooklyn Law School this Spring. Undoubtedly his work will have a widespread effect in improving the federal courts' consideration of such cases.

Third, Eileen Levine, the project case manager, made a tremendous effort to develop a successful case management system, to locate and assemble papers scattered in many offices of the court or lost, and to preliminarily review all submissions from the parties.

Fourth, I should particularly like to express gratitude for the work of my previous law clerks, Katherine L. Ashenbrenner and Aram Schvey; my present law clerks Joshua Hill and Jennifer Murray; and student interns Jill Rogers, Elizabeth Nash, Jason M. Schloss, Anthony P. Dykes, Jennifer Bernstein, Andrea Anderson and Derrick Toddy. My case manager, June Lowe, and secretary, Evelyn Hofmann, were instrumental to the success of this project.

Fifth, commendation is due to members of the Clerk's Office under the direction of Robert C. Heinemann and James Giokas. The project was aided by many members of the office and by the staffs of individual judges and magistrate judges, particularly by Brian Rifkin, Felix Chin, Lakeshia Jackson, Alicia Guy, Anthony Salome, Lorraine Drayton and Andrew Jackson, all under the leadership of Michael Kramer.

Sixth, the five district attorneys and their staffs in this district—from the counties of Richmond, Kings, Queens, Nassau, and Suffolk—made every effort to promptly provide records, briefs, witnesses and other evidence at hearings. Penal authorities were invariably cooperative in making prisoners available by telephone for hearings.

Seventh, where counsel for petitioners were appointed by the court or appeared independently, briefs and arguments were invariably of a high professional order.

Eighth, special mention must be made, and gratitude expressed, for the many secretaries who added enormously to their regular workload by volunteering to type hundreds of memoranda issued in connection with these cases. They are: Marie Armato, Amanda Black, Jean Capobianco, Marie Chiodo, Karen Constantini, Pat D'Archille, Louise Falcone, Cristine Gitsas, Loretta Johnson, Dolores Joy, Madeline Kelly, Lynn Langdon, Germaine Manuel, Catherine Stanisic and Lea Vasquez.

## II. Importance of Habeas Corpus

So important is the writ of habeas corpus in our jurisprudence that its protection was imbedded in Article I of the Constitution of the United States by "We the People," before the Bill of Rights was adopted. This powerful tool for the protection of individuals' constitutional and statutory rights against overreaching of government and its agents was inherited as one of our great treasures from Great Britain. It is succinctly described in the Columbia University Encyclopedia (Fifth Edition 1993):

> **habeas corpus** [Lat.,= you should have the body], WRIT directed by a judge to some person who is detaining another, commanding him to bring the body of the person in his custody at a specified time to a specified place for a specified purpose. The writ's sole function is to release an individual from unlawful imprisonment; through this use it has come to be regarded as the great writ of liberty. The writ tests only whether a prisoner has been accorded due process, not whether he is guilty. The most common present-day usage of the writ is to appeal state criminal convictions to the Federal courts when the petitioner believes his constitutional rights were violated by state procedure. An individual incarcerated in a state prison is ex-

pected to exhaust all possible routes available before applying to a federal judge for habeas corpus. The term is mentioned as early as the 14th cent[ury] in England, and was formalized in the Habeas Corpus Act of 1679. The privilege of the use of this writ as a safeguard against illegal imprisonment was highly regarded by the British colonists in America, and wrongful refusals to issue the writ were one of the grievances before the American Revolution. As a result, the Constitution of the United States provides that "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it" (Article I, Section 9). President Lincoln suspended habeas corpus in 1861 at the beginning of the Civil War, and his decision was upheld by Congress—despite protests by Chief Justice Roger Taney that such suspension was not within the powers of the President. The Supreme Court's liberal decisions in the 1950s and 1960s in the area of prisoners' rights encouraged many incarcerated persons to file writs challenging their convictions. In recent years, the Court ... has limited multiple habeas corpus filings, particularly from prisoners on death row.

While, as indicated in Part VI, *infra*, it is recommended that the challenges in this court to unlawful state incarceration be decided within up to one-hundred days, in some instances almost immediate action is required to protect against injustice by issuance of the Great Writ. If, for example, someone is illegally being detained and about to be removed from the court's jurisdiction, immediate issuance of the writ— with actual production forthwith of the prisoner in person under pain of punishment for contempt, including imprisonment of the persons or persons responsible for withholding the body—would be justi-

fied. Even in connection with state incarcerations after trial, some cases may be so clear and continued detention so onerous as to require immediate release.

In his First Inaugural Address in 1801, Thomas Jefferson emphasized that "freedom of person under the protection of habeas corpus" is one of the "principles" in the "bright constellation which has ... guided our steps ... [on] the road ... to peace, liberty, and safety." Merrill Peterson, ed., *Jefferson, Autobiography, Notes on the State of Virginia, Public and Private Papers, Addresses, Letters* 495 (1984). Except for a brief period during the Civil War, the Great Writ has continued to protect us. Delay cannot be tolerated by federal courts.

### III. New York State Protections

As indicated below in Part IV, *infra*, only nine petitions—just 2% of the cases reaching final disposition in this project— resulted in a grant of the writ. Those cases are subject to appeal by state authorities. Also subject to appeal by the petitioners are those cases in which the petition was dismissed but a certificate of appealability was granted by this court, or in which a certificate was denied by this court but will be granted by the Court of Appeals for the Second Circuit.

Inevitably, even in the fairest judicial system, deviations from the due process required by our rule of law may intrude. Improper convictions should not be tolerated. Yet, the paucity of cases in which constitutional rights have been violated is reflective of the high level of criminal justice administered in New York State courts.

In going through the records and briefs of these five hundred cases, I am impressed by the fact that in many respects New York provides more extensive procedural and substantive protections for crim-

inal suspects and defendants than do the federal trial and appellate courts. The five district attorneys in the Eastern District of New York are, in general, scrupulous in enforcing state and federal limitations on prosecutions. The police in these counties, in general, do not violate constitutional rights in their investigations and properly preserve evidence. The New York trial and appellate judges are energetic, fair and learned, following the law with the help of excellent charge books and well-drawn statutes. Defense counsel, whether appointed or retained, are usually effective and highly professional in protecting the rights of their clients in the state courts.

It is, of course, depressing to read in these five hundred state cases the tragic stories of so many victims and of hundreds of defendants—impoverished in mind, spirit, and ethical values—who rob, burglarize, assault, murder, rape, commit forced sodomy and prey on infants and adults alike. So many of the deaths related in these cases are due to illegally possessed guns. So many lives—both those of the victims and those of the convicts who will spend lengthy terms in prison—are unnecessarily destroyed. "Twenty-five years to life" is a constantly repeated refrain from the sentencing judges. Particularly distressing are the huge prison terms for minor street drug dealers, themselves often drug addicts driven to sell in order to find surcease from the evil urge for momentary pleasure that motivates them; these long sentences are, as is generally acknowledged, an artifact of the unnecessarily draconian Rockefeller Drug Laws.

## IV. The Cases

### A. Statistics

In all, this project included 500 cases. The earliest was initially filed in 1996 and the latest in December 2002. Disposition of the cases was as follows:

| | |
|---|---|
| 9 | Writ granted, with release or a new trial ordered. |
| 380 | Dismissed as lacking sufficient merit. |
| 42 | Dismissed as time-barred. |
| 3 | Dismissed as second or successive. |
| 16 | Dismissed for failure to prosecute or as moot. |
| 3 | Consolidated with earlier petition. |
| 3 | Reassigned to original judge, per request. |
| 44 | Closed administratively for exhaustion or otherwise unripe for review. |
| 500 | Total cases. |

In 68 cases a certificate of appealability was granted by this court.

### B. Grants of the Writ

The writ was granted in nine cases, described briefly below. Any subsequent history, where known, is stated. In addition to these, it should be noted that a substantial number of other cases were quite close but were denied due to the highly deferential standards of review imposed by statute and case law.

#### 1. *Thomas v. Kuhlmann,* 97–CV–2096

Thomas was convicted in 1988 of second-degree murder for the beating and stabbing death of a woman with whom he had had a romantic relationship. Because the victim's apartment was locked from the inside, the police speculated that her assailant had entered and left through a window adjoining the fire escape. The primary evidence of Thomas's guilt was the testimony of a drug addict who, on the night of the homicide, was in the stairwell of an apartment building across the courtyard from the victim's building. She testified that she observed Thomas on the fire escape of the victim's apartment building, in front of the victim's window, for about twenty minutes. Although the trial court expressed concern at a pretrial hearing that the witness's description of the layout of the buildings was confused and confusing, defense counsel never visited the crime scene. If he had, he would have

discovered that the witness's testimony was a factual impossibility, since the victim's apartment was on the opposite side of the building and not visible to her. Counsel's failure to investigate under these circumstances was deemed ineffective and prejudicial to Thomas, warranting a grant of the writ.

Thomas was subsequently offered a plea bargain in lieu of standing retrial. He pled guilty to first-degree manslaughter in satisfaction of the indictment.

### 2. *Harris v. Artuz,* 97–CV–2135

Harris was convicted in 1991 mainly of second-degree murder for the shooting death of a man whom he allegedly attempted to rob of a coat. The evidence against him was primarily the identification testimony of four eyewitnesses, one of whom claimed to have been shot in the hand by Harris. All of the eyewitnesses knew each other and knew the victim, who had earlier in the day been arguing with one of them. Medical records in possession of the defense at trial indicate that the man who claimed to have been shot in the hand was in fact stabbed and not shot. These records contradicted the testimony of all four of the prosecution's eyewitnesses—all of whom were related or friends—and strongly suggested the possibility that the witnesses colluded in their testimony in an effort to frame petitioner for a crime that was committed by one of them.

Instead of presenting evidence in support of an argument that the eyewitnesses colluded and lied, defense counsel conceded inaccurate and inculpatory facts, arguing to the jury that all four eyewitnesses had misidentified petitioner as the shooter. Because it beggars belief that defense counsel could have been aware of the medical reports in the record and yet opted to pursue a "strategy" that all but assured Harris's conviction, the writ was granted on the basis of ineffective assistance of counsel.

### 3. *Benn v. Greiner,* 98–CV–5621

Benn was convicted principally of first degree sodomy and first degree attempted rape in 1991. The complainant suffered from chronic schizophrenia and experienced severe sensory, auditory and visual hallucinations, including paranoid delusions that unidentified people were following her or attempting to control her. She was also a convicted pedophile, having pled guilty to the sexual abuse of her four-year-old nephew. She has used cocaine, crack and marijuana in the past, though she testified that she had only "tried" crack cocaine once and had not used any drugs since 1987.

Prior to calling the complainant to the witness stand, the prosecutor moved, pursuant to New York's rape shield law, to preclude petitioner from cross-examining her "about any other or prior sexual experience," noting that "in the records that we received there's some statements about the complainant being sexually assaulted in the past by family members." Defense counsel opposed the motion, explaining to the court that the complainant "made a similar allegation about someone else later the same year and she's also made similar allegations as to her father, her uncles and her cousins. And I think it shows a history and a pattern of making things up." The trial court, refusing to rely on the rape shield law, nonetheless precluded any questioning about other allegations by the complainant of sexual abuse, concluding that the defense had failed to establish a good-faith basis for the implication that her other allegations were false or the product of delusion.

The writ was granted on the ground that petitioner's Confrontation Clause rights

were violated. A pattern of unverified and unprosecuted accusations of sexual abuse by a woman who was frequently hallucinatory and delusional could have been viewed by a jury as casting substantial doubt on the validity of the charges made in the instant case. As explained in the decision, it was a relatively close call whether, in light of the evident physical trauma suffered by the complainant, the constitutional error was harmless. Because the burden is on the government and a petitioner should prevail when the federal judge feels himself in virtual equipoise, the error could not be deemed harmless.

### 4. *Batten v. Greiner,* 97–CV–2378

Batten was convicted in 1984 of second-degree murder for the shooting of a furniture-store owner. The conviction was achieved almost solely on the basis of an eyewitness's identification, from a mugshot photograph, of Batten as the shooter. The eyewitness was certain of his identification even though he told police that the assailant was clean-shaven and Batten, when he was arrested three days after the incident, had prominent sideburns, a mustache and goatee. No physical evidence linked Batten to the crime. He testified in his own defense concerning his whereabouts that day and two alibi witnesses corroborated his story. Two more alibi witnesses were, for an unexplained reason, not called to testify.

Six years after his trial, in response to a Freedom of Information Law request, Batten was provided for the first time with four previously unproduced police reports. One indicated that a confidential informant told police five days after the shooting that, prior to the robbery, his girlfriend was approached by an employee of another furniture store owned by the victim, and that the employee asked her if she "had any friends that would rob the store for

him" on one of the days on which the shooting occurred. The detective wrote in the report that, "In view of the above stated facts, it is requested that the case be further investigated and marked open." Another of the reports described an interview with Douglas Barnes, the person believed to be the individual implicated by the informant. Barnes was not cooperative with the investigators. In a third report it was noted by the investigating detective that Barnes had been deported after the detective contacted United States immigration authorities about him. The failure of the prosecution to produce this material was deemed a violation of *Brady* warranting the grant of the writ.

The district attorney reportedly offered to allow Batten to plead to first-degree manslaughter in satisfaction of the indictment. Batten refused the offer.

### 5. *Eisemann v. Herbert,* 99–CV–2826

Eisemann was convicted in 1986 of three counts of first-degree sodomy for sexually molesting his girlfriend's seven-year-old daughter. He was represented at trial by the same lawyer who represented his father on charges that the father had sodomized the same girl. Eisemann's father was not a co-defendant. Prior to the start of Eisemann's trial, the father pled guilty to the charges lodged against him. In the course of representing both petitioner and the father, the attorney committed numerous egregious violations of the rules of professional responsibility and the law, bilking the Eisemann family of exorbitant sums of money, fabricating affidavits to excuse his conduct, threatening to put the petitioner in jail if he did not vouch for the fabricated affidavits, and advising him to flee while the jury was deliberating. The lawyer was later disbarred.

The writ was granted primarily on the ground that representation of the father

and son in a criminal matter where both men were alleged to have committed the same kind of crime at the same time against the same complainant created an actual conflict of interest because the dual representation precluded petitioner's counsel from pursuing reasonable defense strategies.

### 6. *Cox v. Donnelly,* 99–CV–8216

Cox was convicted in 1994 primarily of second-degree murder after he was tried for shooting the boyfriend of a female acquaintance. The boyfriend, nicknamed "Bear," had earlier in the day forced his way into the woman's apartment and punched Cox twice. Cox left the apartment, knowing that Bear had a reputation for jealousy and violence. When he later returned to the apartment, Cox was armed with a handgun. Bear arrived soon after, again forcing his way into the apartment, kicking and shoving the woman. Bear made his way to the bedroom into which Cox had retreated and the two began a conversation that soon deteriorated into angry argument. Eventually Bear, who knew that Cox was holding a gun, challenged him by asking, "What are you going to do, shoot me?" Cox then fired one fatal bullet into Bear's head.

That Cox had shot Bear was never contested at trial. The only issue was whether he had intended to kill Bear when he shot at him. The trial court instructed the jury on this point, explaining, "The law states that a person intends the natural consequences of his acts." Discussing a near-identical instruction, the Supreme Court explained in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), that the creation of such a mandatory presumption violates the Due Process Clause by relieving the State of the burden of persuasion on an element of an offense. Counsel's failure to request a proper instruction was constitutionally ineffective and prejudiced Cox, a conclusion supported by the fact that the jury sent out a note asking for clarification of the "legal definition of intent to kill."

### 7. *Jackson v. Edwards,* 01–CV–0501

Jackson, the superintendent of an apartment building, was convicted primarily of second-degree murder in 1997 for the shooting death of Selwyn Anthony Brown. Jackson was changing the locks in a vacant apartment when Brown entered the apartment, demanding that Jackson give him the set of keys to the apartment. Brown apparently felt entitled to the keys because his girlfriend's mother had previously rented the apartment. Brown pushed and punched Jackson when he refused to surrender the keys. Jackson removed an unlicensed gun from his pocket and shot Brown, killing him. Jackson confessed to the shooting but averred that he had used deadly force in self-defense.

The trial court refused a defense request to charge the jury on self-defense, even though New York's penal law allows the use of deadly force (under limited circumstances, arguably supported by the evidence) where a person reasonably believes that another person is committing or attempting to commit a burglary or a robbery. The writ was granted because the trial court's refusal to charge the jury properly denied petitioner due process of law.

### 8. *Pulinario v. Goord,* 02–CV–3681

Pulinario, a young woman with an I.Q. of 70, was convicted in 1997 of second-degree murder for the shooting death of her alleged rapist, Imagio Santana. She and Santana had previously had a romantic relationship but, according to Pulinario, Santana forced her to have sex against her will. Several days later Pulinario con-

fronted Santana and shot him, resulting in his death. Prior to trial, defense counsel informed the court that he intended to argue that when Pulinario fired, she was suffering from Post–Traumatic Stress Disorder ("PTSD") and Rape Trauma Syndrome ("RTS"). The trial court denied a pretrial prosecution motion to exclude evidence concerning these disorders.

As required by statute, Pulinario allowed herself to be interviewed by a state psychiatric expert. During the interview she denied—just as she had denied to her own psychiatrist—that she had had a previous sexual relationship with Santana. Midway through the trial, after two weeks of testimony, the prosecution again moved to exclude evidence of PTSD and RTS, contending that Pulinario had lied to the state psychiatrist and therefore had not "fully cooperated" during the court-ordered examination, as required by statute. The trial court agreed and excluded the evidence.

The trial court's preclusion order in the midst of trial was an unjustifiably harsh sanction that, under the circumstances of the case, effectively denied the defendant an opportunity to mount a defense. The trial court discounted expert testimony that it is common for a rape victim suffering from RTS to lie about a past sexual relationship with her assailant. The jury could reasonably have decided whether sufficient evidence had been present in support of the proposition that rape victims are often overwhelmed by feelings of shame and embarrassment, frequently fear that their claims of rape will be greeted by skepticism, often lie about their relationship to the attacker, and conceal aspects of their personal history which they believe will cause others to dismiss their accusations. Rather than leave these matters to the jury, the trial court by precluding all evidence of RTS and PTSD effectively

sandbagged the defense, which from the start of the trial had molded its tactics in reliance on the court's initial ruling. Having been denied a fundamentally fair trial, Pulinario was entitled to the writ.

### 9. *Somerville v. Conway*, 02–CV–6679

Somerville was convicted of burglary and assault in New York. Rather than challenge his convictions, he contested only his sentence, which was enhanced after the sentencing court determined that he should be punished as a second felony violent offender due to a prior conviction in Maryland for robbery with a deadly weapon. On direct appeal he contended that trial counsel was ineffective for failing to argue to the sentencing court that the Maryland crime of robbery with a deadly weapon does not necessarily establish every element of any New York State felony and that treatment as a second felony violent offender was therefore inappropriate. Respondent conceded on direct appeal that if counsel had made this argument it would have been successful, but contended that it would take "superior representation" to raise such a claim during a sentencing hearing. In a terse order affirming the sentence, the Appellate Division apparently agreed.

In the habeas proceeding, respondent changed his tune and withdrew his concession that the Maryland conviction was an improper foundation on which to rest second felony violent offender status. Somerville was granted the writ because trial counsel's failure to be familiar with the sentencing law governing his client's case fell below a reasonable professional standard and prejudiced his client.

### V. Reasons for Speedy Disposition

#### A. Petitioner

A petitioner who has been illegally imprisoned or otherwise deprived of his lib-

erty should be released as promptly as possible. Yet there are instances where a defendant entitled to release must wait for many years while his case languishes in this court. This is unfair. In the files are numerous letters in effect asking, "Where is my case? Why can't I get a decision?"

Delay is intolerable in a system which, like ours, is devoted to the rule of law and equal justice for all. Since there is no constitutional requirement for representation by counsel in post-appeal state or federal collateral attacks, it is the poor who find themselves unable to find counsel to help expedite decision, and it is the poor who are most disadvantaged by our court's delays.

Even to those petitioners whose claims are without merit, the delays are frustrating and unfair. Letters in effect ask, "Why after so many years of delaying a decision do you now dismiss on the ground that my claim is frivolous? Why could you not tell me earlier?" Such plaints cannot encourage a rehabilitative state of mind.

### B. State System

Unnecessary delays in deciding these cases have an adverse effect on the state courts and prosecutorial agencies. Long after a case has been forgotten by all state officials, our court may require a petitioner to go back to the state system to exhaust remedies there. The district attorney (or a new assistant) must become familiar with the case all over again; assemble records long scattered; and sometimes try to obtain witnesses to reconstruct a hearing on matters such as alleged bias in jury selection or alleged lack of a rational reason for defense counsel's failure to take certain steps during trial and appeal. In a considerable number of cases defense counsel are unavailable as witnesses because they are dead or have retired to other states.

The burden of these delays on the part of our court does not enhance the spirit of comity between state and federal courts needed for the effective joint operation of a state and federal system in protecting the public as well as defendant's rights.

### C. Federal System

The strains of delay felt by the state courts and agencies are also experienced in our court. A large part of the problem in dealing with these five hundred cases was that the full files could not be located. Some portions—when they could be found at all—were in drawers of law clerks, in the corners of judges' chambers, misfiled, or sent to storage. Duplication unreasonably burdened our court and the various district attorneys and defense counsel. Many thousands of pages of documents had to be recopied by the State at considerable expense. Moreover, our files were replete with correspondence from petitioners and others that needed to be answered because of the delays. Not infrequently, delays would engender new, inadequate, claims, tacked on by petitioners as an afterthought, that required lengthy analysis of the propriety of amendment, the need to allow a stay for exhaustion, and resolution on the merits.

When the Court of Appeals for the Second Circuit returns a case to this court for a "reconstruction hearing" as to competency of a petitioner at the time of the state trial, as to fairness of the voir dire, or as to the strategies or other reasoning of defense counsel now charged with inadequacy, delays of years lead to difficult or illusory hearings.

There is the distinct morale problem faced by members of the court who are aware that, despite their hard work, the court was failing to provide prompt relief to hundreds of state prisoners looking to us for protection of their constitutional

rights. The good reputation of this court in defense of constitutional rights is depreciated by delays in protecting those among a group least capable of protecting themselves.

## VI. Proposed Procedures

The following recommendations are made for future handling of habeas cases by this court.

### A. Timing

A maximum of one-hundred days from filing to decision should be our goal. Any open state habeas case not closed after one hundred days should be listed under the name of the judge or magistrate judge to whom it has been assigned. This will alert the judge or the magistrate judge, and the judge's staff to the need for action. It will also enable the Chief Judge to reassign these old habeas cases to relieve judges who cannot dispose of them because of particularly heavy caseloads, illness or other reason.

### B. Procedures

An order to show cause should go out as soon as the petition is received. Trial and hearing transcripts, and the briefing and decisions with respect to all state court proceedings should be demanded immediately so as to prevent delays later in the process. Requests for *in forma pauperis* status should likewise be addressed in this order. *See* Exhibit A *. Requests by petitioners for appointment of counsel, for copies of the state court record, and other such routine matters should be handled by forms without delay. *See, e.g.,* Exhibit B (granting appointment of counsel); Exhibit C (denying appointment of counsel); Exhibit D (denying state court record). My experience suggests that a paraprofessional member of the Clerk's Office can handle

all such matters and assemble the files promptly. One such person specializing in this process should be able to handle all habeas matters for the court. *See* Part C, *infra.*

Respondents should not be permitted to delay by adjournment except in extraordinary circumstances. All respondent's papers should be in the court within forty days after the filing of the petition. Petitioner's response should be required to be in the court's possession twenty days after the response is filed. *See* Exhibit A.

Even before all papers are received, the court can order a hearing. Normally, a petitioner need only be present by telephone. *See* Exhibit E. Any hearing should be no later than seventy days after the petition is filed. A transcript of the hearing should be furnished to any petitioner who cannot afford one.

In most cases a hearing will not be required. In those cases, the matter should be decided within seventy days of filing.

If a hearing is held, the petition can be decided orally, with a written decision to follow. A written decision after hearing should normally be issued within eighty days of the filing. Forms for the written decision are reproduced and appended to this memorandum. *See* Exhibit F (denial on merits); Exhibit G (dismissal as time-barred); *see also* Exhibit H (compendium of legal analyses for frequently raised issues on habeas).

Where the federal proceeding must be stayed to allow a petitioner to exhaust state remedies, the case should be marked "administratively closed." *See* Exhibit I. My experience indicates that there are few instances where unexhausted unbarred claims have much merit. In such instanc-

---

* Exhibits A–K: [not included for publication].

es our court should exercise its discretion to decide the case without requiring exhaustion. This will save unnecessary work for our court as well as the state courts, petitioners, respondents, and the Court of Appeals for the Second Circuit.

Where court papers are returned because the petitioner has failed to apprize the court of his current address, dismissal for failure to prosecute is ordinarily warranted. *See* Exhibit J. In those instances where petitioner subsequently seeks to communicate with the court, it may be appropriate to reopen the matter.

Applications for reargument will almost never be granted. Advice on how to proceed in the Court of Appeals should not be given by our judges or magistrate judges.

In general, assignment of any petitions by a judge to a magistrate judge for report—as is frequently done under present practice—will only slow things down, add to the work of our magistrate judges and eliminate little burden from our judges, who now review the magistrate judge's report in much the same detailed way as a law clerk's draft would be reviewed. An alternative approach is detailed in Part D, *infra*.

A draft of the training manual written by Special Master Marc Falkoff is attached as Exhibit K. Instruction on these matters for incoming law clerks each year should be routine.

In general, the facts in most cases can be obtained from defense counsel's brief on direct appeal or from respondent's affidavit or brief in this court. Post-conviction state procedural history can be obtained readily from respondent's affidavit in this court. The briefs on the law by respondents are generally good and can usually be relied upon. Most *pro se* petitioner's briefs are of relatively little value.

Where the petitioner is represented by counsel, the briefs can be relied upon.

The decision and opinions of the state trial and appellate courts are generally short. They are often worth quoting at length.

This report addresses run-of-the-mill state habeas cases. Where a state death penalty case is involved much more time and effort will be required.

C. Filing and Control by Paraprofessionals in Clerk's Office

Several administrative reforms would allow for more expeditious processing of state prisoner habeas matters:

(1) Respondents should be directed to send transcripts and routine briefing papers to the clerk's office for docketing and eventual delivery to chambers. A common practice is now for respondents to be instructed to send papers directly to chambers, bypassing the clerk's office with the result that papers are sometimes never docketed.

(2) Provision should be made for the easy retrieval of the state court record where it has been provided by the respondent but the habeas matter has been stayed and closed. At present the closed case files (with the record) are frequently put into deep storage or otherwise removed from easy access, resulting in long delays when the matter is reopened and otherwise ripe for decision.

(3) Chambers should make a concerted effort to keep case files orderly and free of internal memoranda and other confidential court papers.

(4) Some counties presently make a practice of sending the court the originals of the entire state court record, rather than proceeding, as do most other counties, by sending the court

copies of only the relevant portions of the record. This practice should be discouraged since (a) where matters must be stayed to allow for exhaustion in the state courts, the original record must be delivered back to the state courts and eventually redelivered to this court, causing significant delays; and (b) the possibility of losing or misplacing the original state court record by chambers or the clerk's office of this court is not insignificant.

(5) Docket sheets should specify which portions of the state-court record have been filed and when they were filed.

(6) Where a trial entailed co-defendants and one of the co-defendants has filed a habeas application, subsequent habeas applications from other co-defendants should be assigned to the same judge.

(7) Cases that have been administratively closed should not be assigned a new docket number when a petitioner seeks to reopen the proceedings.

(8) A paraprofessional should perform an initial screening of habeas applications (a) to identify whether the respondent is alleging a failure to exhaust or time bar, and (b) whether the state court record has been provided to the court.

(9) The paraprofessional should, at the earliest stage in the process, check to determine whether a new habeas application is related to another case or appears to be a "second or successive" petition. Related cases must be noted on the docket sheet.

(10) Prisoner and attorney contact information must be regularly updated on the docket sheets.

(11) Respondents should be requested to submit bound copies of transcripts.

(12) Instead of responding to a petitioner's arguments in a single brief, some respondents are referring the court generally to scattered arguments made in state court papers written in opposition to a petitioner's direct appeal, motions to vacate judgment and applications for writs of error coram nobis. This practice increases the difficulty of resolving habeas applications in a timely manner and should be discouraged. A workmanlike affidavit and a brief that integrates the respondent's information and arguments is helpful.

(13) Chambers and the paraprofessional should be aware of the following web sites for tracking the prison addresses of petitioners:

www.docs.state.ny.us (New York State prisoners)

www.bop.gov (federal prisoners)

### D. Division of Court's Workload

The primary reason for delay in the disposition of habeas matters is the large volume of state habeas petitions received by this court. Over the past five years, an average of 550 new cases have been filed per year, with each chambers receiving roughly 20 to 30 of these cases each year. Expanded and more efficient use of the magistrate judges could aid in the timely disposition of these matters.

Magistrate judges are as capable as Article III judges of adjudicating state prisoner habeas corpus applications. At present, magistrate judges are often assigned a "super law clerk" role in the process, reviewing petitions and drafting reports and recommendations that are more consistent with a thorough and exhaustive bench memorandum than with a district judge's final written disposition. To be sure, these well-drafted reports can be—and usually are—adopted in their entirety by the district judge, and no judge will decry the production of an exhaustive and well-written report. The question is only whether

so much time should be devoted to production of advisory memoranda.

Significant time savings could be achieved if magistrate judges were to be accorded more discretion in the process. It should be understood that the magistrate judge is expected to act in the same way as an Article III judge, issuing a prompt final judgment. Binding in fact without consent would not be appropriate under current statutes.

At present, the magistrates appear to work under the reasonable presumption that every "procedural" consideration in the habeas context must be addressed with respect to all claims raised by a petitioner and that, in an abundance of caution and to stave off potential delay down the road, each claim should further be reviewed on the merits regardless of whether the procedural considerations are dispositive. My experience with these 500 cases has demonstrated that such exhaustiveness is often unnecessary. Many claims are obviously without merit when considered by experienced jurists—as all our magistrate judges are.

The procedural difficulties in the habeas context are, of course, legion. Defaults, exhaustion, Rule 15 amendment and timeliness all present hurdles that a petitioner must overcome before the writ may be granted. Resolution of such issues can be—to a greater or lesser degree depending on the circumstances of the individual case—tedious, puzzling, difficult and time-consuming. Ascertaining the appropriate standard of review to be applied and justifying the federal court's decision—particularly in light of some recent decisions of the Court of Appeals for the Second Circuit requesting detailed explanations from this court—can be burdensome in many instances.

A district judge confronted with a host of claims that are meritless under any standard of review will ordinarily stride boldly around the procedural thicket, denying the writ and simply declaring consideration of procedural issues, particularly exhaustion, unnecessary. In similar circumstances, magistrate judges seem to feel compelled—not improperly, of course—to work their way through each of the procedural snares set forth by Congress and the courts. Such caution is unnecessary. It commonly breeds reports on relatively mundane habeas petitions that weigh in at fifty, sixty, seventy or more pages, where a district judge's decision would ordinarily dispose of the matter more succinctly. The root of the problem is the magistrate's perception that resolution of the petition is ultimately the district judge's responsibility and that the district judge should be alerted to all procedural and material issues in the petition.

The magistrate judges should be expected to exercise their powers as if they were Article III judges. With this precept in mind, I recommend that the court adopt the following routine procedure:

(1) Half of a chamber's allocation of incoming habeas corpus cases should automatically be diverted to a specific magistrate judge's docket immediately. No screening by the district judge's chambers is necessary since such screening is itself time-consuming and is of limited utility. Petitions that can be easily disposed of and those that require more reflection will, on average, be equally distributed between the magistrate and district judge. Each judge's chambers will—based upon the number of our judges and average yearly intake—handle on its own approximately fifteen cases a year from start to finish. The magistrate judges will each have responsibility for slightly more than fifteen cases a year, effectively cutting the habeas docket of each district judge in half.

(2) Magistrate judges should proceed in the same manner detailed in sections A and B of Part VI, *supra*.

(3) Magistrate judges should write reports and recommendations in these cases in the form of proposed judgments, as if they were exercising Article III authority rather than merely serving as an adviser to the court. If a complex question concerning procedural default or the proper standard of review should arise, the magistrate judge should feel free to avoid the question if resolution on the merits clearly warrants dismissal of the petition.

(4) Given the high quality of the magistrate judges in this court, it can be assumed that in almost every case the proposed judgment of the magistrate judge will be adopted by the district judge. It is unnecessarily time-consuming to seek the consent of the parties to final disposition of the habeas petition by a magistrate judge. The filing of a magistrate judge's proposed judgment, with proper notice to the parties and an adequate (though brief) period in which to raise objections, should be sufficient to allow the district judge to rule knowingly on the matter. Renewed review of the record is unnecessary where the magistrate has already engaged in the exercise.

Although the magistrate judges will nominally continue to generate reports, in substance their work should be deemed presumptively dispositive of the habeas matter. It is entirely proper for district judges to rely heavily on the legal and factual determinations of the magistrate judges appointed by this court. Such a procedure does not run afoul of either section 101 of the Federal Magistrates Act, 28 U.S.C. § 636, or the general concerns expressed by Justice Brennan in *Wingo v. Wedding,* 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974).

Under this plan, no specialization in habeas cases by any one magistrate judge would be required.

## VII. Conclusion

The present federal habeas corpus law functions well in this federal court, which reviews proceedings from a New York State court system that functions at the highest levels in the administration of justice. A sound balance between the need for finality and for enforcement of federal rights has been achieved. The present structure can be both fair and expeditious.

Now that the court's habeas docket has largely been cleared of the backlog, it is to be hoped that unusual measures such as those adopted in the instant project will not need to be repeated.